UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
:
PATRICK QUATRONE           :         3:18-CV-1673 (RMS)
:
V.                         :
:
ANDREW SAUL,               :
COMMISSIONER               :
OF SOCIAL SECURITY[1]      :         DATE: NOV. 18, 2019
:
------------------------------------------------------- x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

On May 27, 2015, the plaintiff filed an application for DIB, claiming that he had been disabled since October 23, 2013, due to epilepsy, diverticulosis, herniated disc, anxiety, depression, colitis, arthritis, and degenerative disc disease. (*See* Certified Transcript of Administrative Proceedings, dated December 10, 2018 ["Tr."] 79-80, 159-160). The plaintiff's application was denied initially and upon reconsideration. (Tr. 79-88, 89-100). On May 26, 2017, a hearing was held before Administrative Law Judge ["ALJ"] Martha Bower, at which the plaintiff

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

and a vocational expert testified. (Tr. 33-58). On July 6, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 12-24). The plaintiff appealed, and on August 15, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 6-9; *see* Tr. 1-5).

On October 9, 2018, the plaintiff filed his complaint in this pending action, (Doc. No. 1), and on December 21, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 18). This case was transferred accordingly. On February 8, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 19), with a brief (Doc. No. 19-1 ["Pl.'s Mem."]), and Statement of Material Facts Medical Chronology (Doc. No. 19-2) in support. On February 13, 2019, the defendant filed his Motion to Affirm, with brief (Doc. No. 20-1 ["Def.'s Mem."]) and a Statement of Material Facts in support (Doc. No. 20-2).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 19) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 20) is DENIED.

II.  FACTUAL BACKGROUND

A.  MEDICAL HISTORY[2]

1.  Pre-Onset Date Records

The plaintiff saw several providers for diverticulitis, seizures, and neck, back, wrist, and knee pain between February 2013 and October 2013, before the alleged onset date. On February 1, 2013, the plaintiff saw Dr. Charles Adelman, complaining of a change in bowel habits— explosive bowel movements and an inability to control his bowel movements. (Tr. 236). Treatment notes reference a diagnosis of diverticulitis in August 2012 with bouts of diverticulitis two to three

---

[2] This recitation is taken primarily from the plaintiff's Statement of Material Facts Medical Chronology and the defendant's Statement of Material Facts. (Doc. Nos. 19-2 and 20-2).

times per year. (*Id.*). A February 21, 2013 colonoscopy revealed a single medium polyp in the descending colon, which was removed. (Tr. 239). Internal hemorrhoids were also found, and a biopsy was taken, which revealed a "mild nonspecific inflammatory change" in the colon. (Tr. 241). The plaintiff returned to Dr. Adelman on March 6, 2013, again complaining of diarrhea. (Tr. 380).

On April 26, 2013, the plaintiff saw Dr. Adelman, this time complaining of neck and low back pain. (Tr. 251). Treatment notes reflect that the plaintiff's pain radiated into his left upper extremity and left hand, and there is a notation for "cervical radiculopathy," although it is not clear whether Dr. Adelman diagnosed the plaintiff with cervical radiculopathy at that time. (*Id.*). As to the plaintiff's seizures, treatment notes from a May 13, 2013 visit to Dr. James Thompson state that the plaintiff has a history of epilepsy with three seizures since his last visit in November 2011. (Tr. 250). The plaintiff also "had multiple panic attacks" and believed that his medication was making the panic attacks worse. (*Id.*). The plaintiff next saw Dr. Richard Gervasi on July 17, 2013, who increased the plaintiff's dosage of Keppra (his seizure medication). (Tr. 281). An August 27, 2013 x-ray of the plaintiff's wrists showed mild arthritic changes. (Tr. 277). During an October 17, 2013 visit to the emergency room at Norwalk Hospital, an x-ray of the plaintiff's right knee revealed minimal arthritis and chondrocalcinosis, no acute fracture or dislocation, and small to moderate joint effusion. (Tr. 424). Dr. Christopher Coyne noted that the plaintiff had "swelling" and "limited range of motion" but was "able to bear weight with [a] cane." (Tr. 444). That same day, Dr. Gervasi noted that the plaintiff walked with an antalgic gait. (Tr. 252).

2. <u>Records Within the Period of Disability</u>

On October 30, 2013, the plaintiff presented to Dr. Gervasi complaining of back pain "in

the upper region." (Tr. 273). Treatment notes indicate that the plaintiff had joint pain, wrist weakness, and "burning"; the plaintiff also had back pain, which was "radiating," and a "tingling hand." (*Id.*). Dr. Gervasi diagnosed the plaintiff with carpal tunnel syndrome, cervical radiculopathy, and hypercholesteremia. (Tr. 274). An MRI of the plaintiff's lumbar spine revealed possible L5 spondylolisthesis and unfused dorsal elements at L5. (Tr. 276). A further MRI was recommended. (*Id.*).

On November 22, 2013, the plaintiff was treated at the Norwalk Hospital emergency room for neck pain he experienced after completing yard work. (Tr. 268, 327). The plaintiff's cervical spine was tender upon examination. (Tr. 327). A computed tomography ("CT") scan of the plaintiff's cervical spine revealed no acute fractures and mild multilevel degenerative disc disease at C5-6, C6-7, and C7-T1, resulting in minimal neural foraminal narrowing at those levels. (Tr. 328, 331). The plaintiff returned to the Norwalk Hospital emergency room on December 7, 2013, complaining of neck pain. (Tr. 323). The plaintiff did not see a medical professional for back or neck pain again until December 1, 2015.

On January 21, 2014, the plaintiff had an electrodiagnostic examination ("EMG"), which revealed no electrical evidence of carpal tunnel syndrome, neuropathy, or radiculopathy. (Tr. 260). The results of the EMG were normal. (*Id.*). An electroencephalogram ("EEG") examination was performed on April 24, 2014 to evaluate the plaintiff's seizures. (Tr. 293). Results were normal, and there were "no focal, lateralized or epileptiform features seen." (Tr. 293). On December 12, 2014, the plaintiff saw Dr. James Thompson for a neurological consultation. (Tr. 287). The plaintiff reported that he had two seizures a month despite using anti-epileptic medication. He stated that his seizures lasted two to five minutes, and that he drove and exercised regularly. (*Id.*). The plaintiff's physical examination was "neurologically unremarkable" with no evidence for

4

antiepileptic drug toxicity. (Tr. 288). Dr. Thompson asked the plaintiff to keep a seizure calendar. (*Id.*). He also noted that he might increase the plaintiff's medication but that he needed to wait until he reviewed the plaintiff' past records from other medical providers. (*Id.*).

    3.  <u>Records Post-Dating Alleged Disability Period</u>

The plaintiff returned to Dr. Thompson for a follow-up appointment on January 28, 2015. (Tr. 285). He reported that he had had two seizures since his last visit on December 12, 2014. (*Id.*). He had not missed any medications. (*Id.*). He stated that he drove and exercised regularly. (*Id.*). Dr. Thompson added Lyrica, discussed with the plaintiff potential medication-related side effects, and advised him to avoid certain over-the-counter medications. (Tr. 286).

On February 17, 2015, the plaintiff saw Dr. Gervasi. (Tr. 261). At that appointment, Dr. Gervasi noted that the plaintiff's previously-diagnosed diverticulitis had resolved. (Tr. 262). Physical examination revealed that the plaintiff had a normal gait, no focal neurological deficits, and an appropriate mood and affect. (*Id.*). Dr. Gervasi diagnosed the plaintiff with obesity, seizure disorder, hypertrophy of prostate, hypercholesteremia, and anxiety. (Tr. 263).

On March 12, 2015, the plaintiff returned to Dr. Thompson. (Tr. 283). The plaintiff reported one seizure since his last visit. (*Id.*). He had not missed any medications. (*Id.*). The plaintiff denied side effects from Keppra, but he reported that he could not tolerate Lyrica due to fatigue and headaches. (*Id.*). He again stated that he drove and exercised regularly. (*Id.*). Upon examination, the plaintiff denied joint swelling or decreased range of motion; his neck was supple, and his gait was normal. (Tr. 284). Dr. Thompson did not make any changes to the plaintiff's medications. (*Id.*).

On May 20, 2015, the plaintiff was admitted to the hospital complaining of abdominal pain with frequent bloody diarrheal movements. (Tr. 297, 299). A colonoscopy revealed severe

diverticulitis, a single polyp in the colon, mild proctitis in the rectum, and small internal hemorrhoids. (Tr. 298, 317). The plaintiff had no back pain or muscle pain, his neck had no tenderness, his back had normal range of motion, and his musculoskeletal system had normal range of motion, normal strength, and no tenderness. (Tr. 300-301). A CAT scan revealed colitis from the sigmoid colon to the rectum. (Tr. 303). The plaintiff saw Dr. Adelman on June 3, 2015 and June 7, 2015, both times complaining of diarrhea. (Tr. 377, 386).

On December 29, 2015, the plaintiff began physical therapy for back pain. (Tr. 407). In Norwalk Hospital's Plan of Care, the physical therapist noted an onset date of December 1, 2015. (*Id.*). The plaintiff had reported at his intake appointment that he "suddenly heard a click in [his] lower back" while moving furniture. (*Id.*). He had seen Dr. Lawrence A. Lefkowitz on December 11, 2015, complaining of lower back pain radiating into both lower extremities. (Tr. 404). Dr. Lefkowitz had given him pain medication and referred him for an MRI. (*Id.*). An MRI of the plaintiff's lumbar spine was conducted on December 15, 2015. (Tr. 400). The MRI revealed "[g]rade 1 anterolisthesis of L5 relative to SI with chronic pars defects noted at L5," and "mild central spinal stenosis and moderate bilateral foraminal narrowing, right worse than left." (Tr. 400-401). The MRI also showed "a mild broad-based central disc protrusion" causing "minimal mass effect upon the ventral aspect of the thecal sac" at L4-L5, and "moderate arthritis of the facets bilaterally with a right facet joint effusion." (*Id.*). The MRI did not reveal any "significant central spinal stenosis," but it did show "mild bilateral foraminal narrowing, right worse than left." (*Id.*).

On December 18, 2015, the plaintiff returned to Dr. Lefkowitz. (Tr. 405). The plaintiff reported that he was "doing a little better," but still had "localized lower back pain." (*Id.*). Dr. Lefkowitz noted "[the plaintiff] is not likely to come to surgery," and instead recommended medication and physical therapy. (*Id.*).

The plaintiff began physical therapy on December 29, 2015, with instructions to attend therapy twice a week. (Tr. 407). Approximately a month later, the plaintiff returned to Dr. Lefkowitz, reporting that he had pain relief for most of the day but that he still had two hours of "getting going pain." (Tr. 409). Dr. Lefkowitz recommended an epidural block. (*Id.*).

On February 10, 2016, the plaintiff received a right L4-L5 epidural steroid injection. (Tr. 411). The preoperative and postoperative diagnoses were lumbar herniated disc and lumbar radiculopathy. (*Id.*). At a February 17, 2016 visit to Dr. Lefkowitz, the plaintiff reported that he felt temporary relief after the injection but that the pain came back. (Tr. 413). Dr. Lefkowitz recommended a repeat epidural block in three weeks if the plaintiff did not feel better. (*Id.*).

On March 16, 2016, the plaintiff reported "much less pain." (Tr. 414). Treatment notes reflect that the plaintiff "has some aching" but was not "taking any medications." (*Id.*).

The plaintiff was discharged from physical therapy on May 3, 2016, after completing seven treatments. (Tr. 415). At that time, the plaintiff rated his back pain as 2/10 at rest and 6/10 with activity. He noted that lying on his side, ambulating and climbing stairs exacerbated the pain. (*Id.*). He did not report discomfort upon palpation of his lumbar spine except for at L5. (*Id.*).

On January 4, 2017, the plaintiff presented to Dr. Thompson for an evaluation of his seizures. (Tr. 418). An EEG was normal without focal lateralized or epileptiform features. (*Id.*).

On March 24, 2017, the plaintiff presented at the Norwalk Hospital emergency room, complaining of right neck pain that radiated to his right arm. (Tr. 392). The pain began the day before. (*Id.*). The plaintiff reported that he had been cleaning out a closet and did not have any previous injury. (*Id.*). He denied any fever, weakness, dizziness or back pain. (*Id.*). An examination revealed that the plaintiff's neck was supple, with no tenderness to the right posterior neck and no midline tenderness over the cervical spine. (Tr. 394). The plaintiff's back was not tender, and he

had normal range of motion, strength and no tenderness of his musculoskeletal system. (*Id.*). An x-ray of the plaintiff's cervical spine revealed mild, multilevel degenerative spondylosis with no significant spinal canal stenosis detected. (Tr. 395, 398-99). The x-ray also detected mild left C5-C6, moderate left C6-C7, and mild bilateral C7-T1 foraminal stenosis. (*Id.*). According to the treatment notes, the medical provider believed that cleaning the closet had irritated the plaintiff's neck. (Tr. 396). The last medical record was from Dr. Gervasi, who, on May 26, 2017, wrote a note stating that the "patient use[d] a cane for ambulation due to medical condition since 2013." (Tr. 452).

      B.      <u>THE PLAINTIFF'S HEARING TESTIMONY</u>

At the May 26, 2017 hearing, the plaintiff was 55 years old. He last worked in June 2009 as a collection manager. (Tr. 36). In that job, he managed seven employees; he trained employees and worked with customers "that they couldn't handle." (Tr. 36). After he was laid off, the plaintiff tried to find another job but was not successful. (Tr. 36-37).

During the time period at issue, the plaintiff lived by himself in a house. (Tr. 37). He testified that he was able to bathe and dress himself, although he took a shower only once a week and had trouble washing his feet. (*Id.*). He used a device to help him put on his socks. (*Id.*). The plaintiff testified that he "mostly just stay[ed] in bed all day because [he was] afraid of having a seizure." (Tr. 39). He spent his days watching television. (Tr. 40).

The plaintiff could not remember when the problems with his neck began, but he noted that he saw an orthopedic doctor "for a long time." (Tr. 44). The plaintiff had an epidural "of some sort that they shot in my back," as well as physical therapy, to treat his back pain. (Tr. 38). He took muscle relaxers. (Tr. 39). His doctor suggested surgery, but he did not want to undergo surgery and get "addicted to pain medication" and still be "in a lot of pain." (Tr. 38). The plaintiff

8

did not remember whether his doctor recommended surgery before December 2014. (*Id.*). The plaintiff also took Conazepam and Lorazepam for anxiety. (Tr. 44).

The plaintiff testified that he "can't carry anything heavy" or "do any kind of a motion, like . . . rak[ing] leaves." (Tr. 45). For example, when he was working, he would have to use "one hand [to] pick up [his] shirt and pull [his] arm up onto the table." (*Id.*). He did not "lift anything." (*Id.*). He did not "recall" having any limitations on how long he could stand, and he "could lay down forever." (Tr. 45-46). However, he could only "sit for [] five minutes" before having to stand. (Tr. 46). The plaintiff then testified that he used a cane, which was first given to him by Norwalk Hospital, for "about four years, maybe longer." (Tr. 46-47). The cane "help[ed] . . . [his] back, so . . . [he was] not putting all this pressure on [it]." (Tr. 48). He testified that he needed the cane "[e]specially for standing" and that sometimes, while waiting in line at the store, he would sit down. (*Id.*). The cane was for "pain and strength," "not falling." (*Id.*). When asked whether he was able to grocery shop, the plaintiff testified that, in 2013 and 2014, his nephew helped him, but now, he had "[his] friend pretty much get my stuff." (Tr. 48-49). The plaintiff would "hold onto the basket" and "lean forward on it" and "point to things that [he] want[ed]." (Tr. 49). In 2014, he could not walk to the back of the store, get a gallon of milk, and carry it to the front. (Tr. 49). He explained that "[i]t would take like an . . . hour for me to do it." (*Id.*).

Regarding his seizures, the plaintiff testified that, in 2013 and 2014, he had "like five, six – maybe six or eight [seizures] a week . . . No. I was having, like – I think I was having three or four a day. It just kept getting – it kept getting worse[.]" (Tr. 43). He explained that his doctors increased his medication to 1500 milligrams, "the most [he] can take," but he still had two or three seizures week. (*Id.*). The plaintiff also testified that he was not allowed to drive because of his seizures. (Tr. 40). Six months had to pass without a seizure for him to get his license back, but

9

he never made it the full six months. (Tr. 43). He described two prior incidents where he had seizures while driving, and his nephew needed to grab the steering wheel. (Tr. 40). He could "not recall the last time [he] drove." (Tr. 41).

The plaintiff also testified to having problems with his memory and concentration. (Tr. 49-50). He testified that he could "watch a whole movie" and not know "what [he] watched." (Tr. 50). He did not read. When asked whether, if someone told him something or showed him how to do something, he would have a problem repeating it, he testified, "[n]ot if it's right away." (*Id.*). However, he did not remember some events from his childhood. (Tr. 50-51). The testimony was not clear, but appeared to suggest that his long-term memory was fading. (*Id.*).

    C.    <u>TESTIMONY OF VOCATIONAL EXPERT</u>

Kenneth Smith, a vocational expert ("VE"), also testified at the hearing. The VE testified that the plaintiff's past work as a collection manager would be classified as a "supervisor, credit and loan collections," a "skilled, SVP level of 7" job performed at the light exertional level by the plaintiff. (Tr. 52). The VE noted that, "[a]t times [the plaintiff] would have to function as a collection clerk," a sedentary exertion job, "skilled, SVP level of 5." (Tr. 53).

The ALJ then asked the VE whether "an individual of the [c]laimant's age, education, and vocational background . . . [who] cannot climb ropes, ladders or scaffolds, and [] cannot be exposed to hazardous equipment, . . . such as unprotected heights, dangerous equipment, cutting tools, vehicle operation," would be capable of performing the past relevant work. (Tr. 53). The VE answered affirmatively. (*Id.*). The ALJ then asked the VE if such an individual would be able to perform "other unskilled work" "at medium." (*Id.*). The VE concluded that such an individual could perform the jobs of "order clerk," "stock clerk," "order filler," "hand packager," and "assembler." (Tr. 53-55). The ALJ also asked the VE for potential jobs at the "light" exertional

level, to which the VE propounded "light janitorial cleaning," "sales attendant," and "entry level office helper." (Tr. 55). When asked whether the VE's answers would change if such an individual were off task 5% of the workday, the VE responded that they would not. (*Id.*). However, the VE testified that "10% and beyond would be problematic, in terms of a person keeping a job." (*Id.*). Finally, the VE testified that if such an individual had to lie down for up to an hour a day and could not do that through normal work breaks, such an individual would not be able to perform any of the jobs mentioned, including the past relevant work. (Tr. 55-56).

Under questioning from the plaintiff's counsel, the VE testified that anything beyond one unplanned absence a month would preclude work. (Tr. 56). He also testified that the jobs he listed at the medium and light exertional levels would not be able to be performed by a person who had to use a cane for standing and walking. (Tr. 57).

III. THE ALJ'S DECISION

Following the five-step evaluation process,[3] the ALJ found that the plaintiff last met the insured status requirements on December 31, 2014, (Tr. 17), and that the plaintiff had not engaged

---

[3] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

in substantial gainful activity since October 24, 2013, the earliest allowable onset date. (Tr. 18, citing 20 C.F.R. § 404.1571 *et seq.*).[4]

At Step Two, the ALJ found that the plaintiff had the severe impairment of epilepsy. (Tr. 18, citing 20 C.F.R. § 404.1520(c)). The ALJ noted that "[t]here is a question of disability related to degenerative disc disease, osteoarthritis and diverticulosis, but the medical evidence of record does not support that these impairments cause more than slight functional limitations that interfere with the claimant's ability to perform basic work-related activities." (Tr. 18). The ALJ concluded at Step Three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the plaintiff's impairment did not meet or medically equal Listing 11.02 (epilepsy).

The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform work at all exertional levels involving no climbing of ladders, ropes, or scaffolds with no work around hazards, such as unprotected heights or dangerous equipment. (Tr. 19-21). At Step Four, the ALJ concluded that the plaintiff was capable of performing his past relevant work as a "collection supervisor, credit and loan collections [sic] and as a collection clerk," (Tr. 21, citing 20 C.F.R. § 404.1565). The ALJ considered the vocational expert's testimony that the plaintiff's past relevant work was considered skilled and performed at the light exertional capacity by the plaintiff, and that a person with the RFC adopted by the ALJ could perform the past relevant work. The ALJ also considered the vocational expert's testimony that a person with the RFC adopted by the ALJ could perform the work of a "order filler," "stock clerk," "hand packager," "assembler,"

---

[4] The plaintiff had previously filed an application for disability insurance benefits, which an ALJ denied on October 23, 2013. (Tr. 59-72). The Appeals Council declined review of the ALJ's decision on May 5, 2015. (Tr. 73-76).

"janitor," "sales attendant," and "office helper." (Tr. 23). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from October 24, 2013, through December 31, 2014, the date last insured. (Tr. 23, citing 20 C.F.R. § 404.1520(f)).

IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might

have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V. <u>DISCUSSION</u>

The plaintiff argues that the ALJ 1) incorrectly found that the plaintiff's epilepsy did not meet or equal the criteria of Listing 11.02(A); 2) "failed at her Step Two severity findings"; 3) "ignored large and relevant portions of the record and made improper weight assignments"; and 4) improperly formulated the plaintiff's RFC. (Pl.'s Mem. of Law, at 2). The defendant argues that 1) the ALJ properly found that the plaintiff's diverticulitis and back impairments were not severe impairments; 2) the ALJ properly found that the plaintiff's epilepsy did not meet or equal Listing 11.02A; and 3) substantial evidence supports the ALJ's RFC finding.

A. <u>THE ALJ'S ANALYSIS OF LISTING 11.02(A) WAS INADEQUATE</u>

The plaintiff argues that the ALJ erred in her conclusion that the plaintiff's epilepsy does not meet meet Listing 11.02(A). (Pl.'s Mem. at 7-10). The Court agrees.

A Listing 11.02(A) impairment requires

> [e]pilepsy, documented by a detailed description of a typical seizure and characterized by . . .:
>
> > A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); . . .

20 C.F.R. Part 404, Subpt P., App. 1, Listing 11.02(A). "Generalized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 11.00(h)(a). The plaintiff bears the burden of demonstrating that the impairment meets "all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

In her decision, the ALJ noted that she considered Listing 11.02, and concluded that the plaintiff did not "have seizures occurring with the required frequency . . .as supported by objective findings to be considered disabled." (Tr. 19). The ALJ also stated that state agency physicians had reviewed the medical evidence and determined that none of the plaintiff's impairments, either singly or in combination, medically met or equaled the criteria of any listed impairments. (*Id.*). The ALJ, however, did not give any additional reasoning or otherwise discuss Listing 11.02.

The ALJ's conclusory assertion that the plaintiff did not have seizures occurring "with the required frequency" to be considered disabled is insufficient. In reaching that conclusion, the ALJ did not cite any medical evidence in the record, let alone explain how she weighed the evidence. The ALJ had a responsibility to "articulate the specific reasons for finding that the listing has not been met, including discussion of the uncontroverted evidence that supports the [plaintiff's] application for benefits, and the significantly probative evidence that he or she rejects." *Howarth v. Berryhill*, No. 16-CV-1844, 2017 WL 6527432 (JCH), at *8 (D. Conn. Dec. 21, 2017) (internal quotation marks omitted) (quoting *Cross v. Astrue*, No. 08-CV-425, 2009 WL 3790177 (VEB), at *3 (N.D.N.Y. Nov. 12, 2009)). The ALJ did not, however, conduct such an analysis here. Because she did not do so, her "conclusory statements are simply inadequate to allow for meaningful judicial review." *Lamar v. Berryhill*, No. 17-CV-1019, 2018 WL 3642656 (MPS), at *8 (D. Conn. Aug. 1, 2018) (remanding after finding the ALJ's "conclusory assert[ion] that there was no evidence that the seizures occurred at least once a month" inadequate).

The issue, therefore, is whether the court can "look to other portions of the ALJ's decision and to credible evidence in finding that [her] determination was supported by substantial evidence." *Nieves v. Colvin*, No. 15-CV-1842, 2016 WL 7489041 (JCH), at *6 (D. Conn. Dec. 30, 2016) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982). Here, "the administrative

record and ALJ's decision do not support such a summary rejection of [the plaintiff's] claim to a listed impairment." (*Id.*). Although the plaintiff visited Dr. Thompson, his neurologist, only once during the relevant period, the treatment records from that appointment reflect that the plaintiff reported that he had two seizures a month despite the use of anti-epileptic medication. (Tr. 287). Moreover, later in the decision, the ALJ notes that "treatment records show[,] at most, two [seizures] a month." (Tr. 21). This frequency of seizures, however, could meet the criteria of Listing 11.02(A), depending on the type of seizure and whether the plaintiff suffered the seizures in consecutive months. *See* 20 C.F.R. Part 404, Subpt P., App. 1, Listing 11.02(A). A review of the record does not reveal a physician's diagnosis as to the type of seizure or a specific representation that the seizures occurred in consecutive months. To the extent that ALJ needed more information, she had an affirmative duty to develop the record. *See Nieves*, 2016 WL 7489041, at *6 (holding that the ALJ had affirmative duty to develop the record in order to obtain a detailed description of the plaintiff's seizures). Thus, the case must be remanded for the ALJ to engage in a more thorough Step Three analysis.

    B.    <u>THE ALJ ERRED IN HER STEP TWO FINDING THAT THE PLAINTIFF'S DEGENERATIVE DISC DISEASE AND OSTEOARTHRITIS WERE NONSEVERE</u>

The plaintiff argues that the ALJ should have found, under Step Two, that his diverticulitis, osteoarthritis, and degenerative disc disease are severe impairments. (Pl.'s Mem. of Law, at 11-14).

"[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimus* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). An impairment is "severe" if it "significantly limits [the plaintiff's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among others,

physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling. *See* 20 C.F.R. § 404.1522(b)(1). The plaintiff bears the burden of establishing that an impairment is severe. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (citing *Green-Younger v. Comm'r*, 335 F.3d 99, 106 (2d Cir 2003).

Taking each impairment in turn, the ALJ's finding that the plaintiff's diverticulitis was not severe is supported by substantial evidence. The plaintiff was not treated for diverticulitis at any time during the relevant period. Nor did the plaintiff present evidence from any physician indicating that he had limitations in basic work-related activities due to his diverticulitis. While objective tests from before the alleged onset date and after the disability period reflects bouts of diverticulitis, these tests do not establish limitations. Indeed, at the plaintiff's February 17, 2015 appointment, Dr. Gervasi noted that the plaintiff's previously-diagnosed diverticulitis had resolved. (Tr. 262). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." *Cote v. Berryhill*, No. 17-CV-1843 (SALM), 2018 WL 4092068, at *5 (D. Conn. Aug. 28, 2018) (quoting *McConnell v. Astrue*, No. 03-CV-0521 (TJM), 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) (internal quotations marks omitted). Accordingly, the ALJ did not err in finding that the plaintiff's diverticulitis was not a severe impairment.

The ALJ erred, however, in finding that the plaintiff's osteoarthritis and degenerative disc disease are not severe impairments. The ALJ found that these impairments were "nonsevere" because they did not cause more than "slight functional limitations" in the plaintiff's ability to perform basic work activities. (Tr. 18). In evaluating these impairments, the ALJ acknowledged that an October 30, 2013 x-ray[5] suggested L5 spondylolsis, and a November 22, 2013 cervical CT

---

[5] The ALJ incorrectly referred to the plaintiff's October 30, 2013 MRI as an x-ray.

scan showed mild degenerative disc disease from C5 through T1; however, the ALJ found that "there is no indication of significant . . . treatment for these conditions prior to the date last insured." (*Id.*). According to the ALJ, treatment notes "do not show neck or back pain of such severity so as to prevent all work." (*Id.*). The ALJ also acknowledged the plaintiff's complaints of knee pain in October 2013, but she noted that "treatment notes show no swelling and intact sensation and strength" and that "[t]esting performed showed only minimal arthritis." (*Id.*).

Preliminarily, the medical records do not support the ALJ's finding of nonseverity. Treatment notes from October 30, 2013 indicate that the plaintiff had "radiating" back pain and a "tingling hand," (Tr. 273), at which time Dr. Gervasi diagnosed the plaintiff with cervical radiculopathy. (Tr. 274). Treatment notes from November and December 2013 indicate that the plaintiff reported neck pain, (Tr. 268, 327, 323), and that the plaintiff's cervical spine was tender upon examination. (Tr. 323). Objective diagnostic evidence (an MRI of the plaintiff's lumbar spine and a CT scan of the plaintiff's cervical spine) revealed possible L5 spondylolisthesis at L5, (Tr. 276), and mild multilevel degenerative disc disease at C5-6, C6-7, and C7-T1, respectively. (Tr. 328, 331). Further, contrary to the ALJ's assertion, Dr. Christopher Coyne's treatment notes from October 17, 2013 reveal that the plaintiff had swelling and limited range of motion in his right knee. (Tr. 444). At that time, the plaintiff was "able to bear weight with a cane" and had an "antalgic gait." (Tr. 252). These treatment notes suggest potential limitations.

Additionally, the record does not include any opinion evidence from a treating or consultative physician, outside of a note from Dr. Gervasi stating that the plaintiff "uses a cane for ambulation due to medical condition since 2013," a statement corroborated by the treatment notes referenced above (Tr. 452). Nor did the ALJ indicate that she relied on the opinion of the state agency examiners. An ALJ cannot substitute her judgment for a medical professional. By finding

that the treatment notes "do not show neck or back pain of such severity so as to prevent all work," and that these impairments do not cause more than "slight functional limitations," the ALJ made a medical determination of ability to work based on her own evaluation of the plaintiff's symptoms, not based on reported limitations of activity. *See Hooper v. Colvin*, 199 F. Supp. 3d 796, 816 (S.D.N.Y. 2016) (finding that ALJ's interpretation of treatment notes was an insufficient substitute for the treating source's opinion on RFC).

Accordingly, given the *de minimis* standard, and because the ALJ's conclusion at Step Two with respect to the plaintiff's osteoarthritis and degenerative disc disease was not the result of proper application of the correct legal principles, this case must be remanded.

V.    REMAINING ARGUMENTS

The plaintiff also argues that the ALJ 1) "ignored large and relevant portions of the record and made improper weight assignments"; and 2) improperly formulated the plaintiff's RFC. (Pl.'s Mem. of Law, at 2). In light of the Court's finding that the ALJ erred at Steps Two and Three, the Court need not address these arguments in their entirety. The Court does find, however, that the ALJ's RFC assessment is not supported by substantial evidence. First, the ALJ afforded the note from Dr. Gervasi that the plaintiff used a cane "no weight" because a "review of the contemporaneous medical evidence of record does not support this limitation during the applicable period." (Tr. 21). As discussed above, that statement is incorrect. Dr. Gervasi's note is corroborated by both his own treatment notes, (Tr. 252), and Dr. Coyne's treatment notes. (Tr. 444). Moreover, other than her discounting of Dr. Gervasi's note, the ALJ did not address the plaintiff's osteoarthritis and degenerative disc disease in the portion of her decision formulating the plaintiff's RFC. Her failure to do so constitutes legal error. *See Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d Cir. 2010) (an ALJ has a duty to evaluate both severe and nonsevere conditions

19

when determining the plaintiff's RFC). Accordingly, the remand here necessitates a reevaluation of the plaintiff's RFC regardless of whether, after considering the medical and diagnostic evidence and applying the *de minimis* standard, the ALJ finds that the plaintiff's osteoarthritis and degenerative disc disease are "severe" impairments.

VI. <u>CONCLUSION</u>

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 19) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 20) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 18th day of November, 2019 at New Haven, Connecticut.

<u>/s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge